PRESENT: Lemons, C.J., Goodwyn, Powell, Kelsey, and McCullough, JJ., and Russell and Millette, S.JJ.

HENSEL PHELPS CONSTRUCTION COMPANY

v. Record No. 151780

THOMPSON MASONRY CONTRACTOR, INC., ET AL.

OPINION BY
SENIOR JUSTICE LEROY F. MILLETTE, JR.
NOVEMBER 3, 2016

FROM THE CIRCUIT COURT OF MONTGOMERY COUNTY
Robert M.D. Turk, Judge

This appeal concerns whether an action by a government contractor against its

subcontractors and sureties was timely filed. We address whether the subcontracts waived the

applicable statute of limitations through reference to the prime contract between the general

contractor and a Commonwealth agency that was not subject to the statute of limitations, or, if

the statute of limitations was not waived, whether it had expired. For the reasons stated herein,

we conclude that the circuit court did not err in finding the action time-barred.

I. FACTS AND PROCEEDINGS

This appeal arises from a lawsuit initiated by Hensel Phelps Construction Company

("Hensel Phelps") against its subcontractors, Thompson Masonry Contractor, Inc.

("Thompson"), Espina Stone Company ("Espina"), I.N. McNeil Roofing & Sheet Metal

Company, Inc. ("McNeil"), and Snyder Waterproofing, d/b/a Snyder & Associates ("Snyder")

(collectively, "subcontractors"), and subcontractors' sureties Fidelity and Deposit Company of

Maryland ("F&D"), and United States Fidelity and Guaranty Company ("U.S. F&G")

(collectively, "sureties"). As this case was decided on a plea in bar and demurrer, the Court

considers the facts as pled by Hensel Phelps in its complaint as well as the contract documents

produced by Hensel Phelps in response to a motion craving oyer. *See EMAC, L.L.C. v. County*

*of Hanover*, 291 Va. 13, 20-21, 781 S.E.2d 181, 184-85 (2016) (observing that when ruling on a demurrer and motion to dismiss to ascertain whether the allegations of a complaint present a valid cause of action, all facts properly pled and any reasonable inferences arising from those facts are accepted as true, and that "documents brought into a case as a result of a motion craving oyer are incorporated into the pleadings and may be used to 'amplify' the facts alleged in a complaint") (alteration omitted).

In 1997, Virginia Polytechnic Institute & State University ("Virginia Tech") awarded Hensel Phelps a prime contract worth $15,539,000 for construction work on the Student Health & Fitness Center / McComas Hall. Hensel Phelps, as prime contractor, hired Thompson, Espina, McNeil, and Snyder as subcontractors to complete portions of the project. U.S. F&G acted as surety to Espina; F&D acted as surety to both Thompson and McNeil.

The prime contract includes a paragraph entitled "Warranty of Materials and Workmanship," warranting that materials shall be in "first class condition," "all workmanship shall be of the highest quality" and "[w]ork not conforming to these warranties shall be considered defective." The prime contract includes provisions for final inspection and final payment. It also includes a provision entitled "Guarantee of Work," stating that, "Except as otherwise specified, all work shall be guaranteed by the Contractor against defects resulting from the use of inferior materials, equipment or workmanship for one (1) year from the date of final acceptance of the entire project by [Virginia Tech] in writing," but that "[n]othing in this section shall be construed to establish a period of limitation with respect to any other obligation which the Contractor might have under the Contract Documents, including liability for defective work under [the Warranty provisions]." There is no explicit provision in the prime contract relating to the applicable statute of limitations period, but the parties do not dispute that, in accordance with

2

Code § 8.01-231, no limitations period would apply to Virginia Tech as a Commonwealth agency.[1]

Construction began in 1997 and was substantially completed under the prime contract in 1998. Virginia Tech made final payment to Hensel Phelps in 1999, which in turn made final payment to the subcontractors. Espina Stone returned to fix an identified problem covered by their warranty, and it concluded all work by June 2000.

Virginia Tech later discovered defective workmanship in the project's construction, and elected to remove, replace, or repair these defects. In April 2012, Virginia Tech asserted a claim against Hensel Phelps under the prime contract, seeking $7,186,178 in compensation for the cost of remedying the defective workmanship. In October 2013, Hensel Phelps demanded that the subcontractors pay Virginia Tech costs attributable to their defective workmanship, but the subcontractors failed to do so. In 2014, Hensel Phelps paid Virginia Tech $3,000,000 to settle the claim, and that same year filed this action, alleging breach of contract and common law indemnity claims against the subcontractors, and breach of contract claims against the sureties.

Subcontractors and sureties filed pleas in bar arguing that the statute of limitations barred the breach of contract claims, and the subcontractors also demurred to the common law indemnity claims. On June 10, 2015, the circuit court granted the pleas in bar as to breach of contract, sustained the demurrers on indemnity, and dismissed the case in its entirety. Hensel Phelps appeals the circuit court order granting subcontractors' and sureties' pleas in bar on the breach of contract claims.

---

[1] Code § 8.01-231 provides: "No statute of limitations which shall not in express terms apply to the Commonwealth shall be deemed a bar to any proceeding by or on behalf of the same."

## II.  DISCUSSION

### A.  *Standard of Review*

The pleas in bar were granted without an evidentiary hearing, based on undisputed facts and the applicable contracts and statutes.  Accordingly, we review the circuit court's ruling on the pleas in bar as to the statute of limitations de novo.  *Van Dam v. Gay*, 280 Va. 457, 460, 699 S.E.2d 480, 281 (2010).

### B.  *Waiver of the Statute of Limitations*

Hensel Phelps assigns error to the circuit court's granting of the pleas in bar, arguing that "[t]he trial court erred in finding Subcontractors did not waive the five-year statute of limitations notwithstanding the flow down provision contained in the Subcontracts referenced and incorporated by the Bonds that expressly requires the subcontractors to assume any and all guarantee or warranty obligations owed by Hensel Phelps to the University arising out of the Subcontractors' performance of the Subcontracts."  Hensel Phelps contends that various so-called flow down provisions within the subcontracts constitute a waiver of the otherwise applicable five-year statute of limitations period for a written contract under Code § 8.01-246(2).

This Court has described "waiver" as "the intentional relinquishment of a known right, with both knowledge of its existence and an intention to relinquish it."  *May v. Martin*, 205 Va. 397, 404, 137 S.E.2d 860, 865 (1964) (internal citation omitted).  We have said, "[T]he owner of such right may waive[] it expressly, either in writing or by parol, and impliedly by inconsistent conduct."  *Creteau v. Phoenix Assurance Co.*, 202 Va. 641, 644, 119 S.E.2d 336, 339 (1961) (internal citation omitted).  Here, Hensel Phelps alleges that the subcontracts contain an express waiver in the writing itself.  An express waiver must reflect both elements:  knowledge of the right's existence and the intent to relinquish it.  While the subcontracts incorporate the prime

contract by reference, a general incorporation provision is insufficient to expressly waive a limitations period, as it does not expressly acknowledge the right to a limitations period or intent to waive that right. *See May*, 205 Va. at 404, 137 S.E.2d at 865.

In addition, Hensel Phelps points to specific phrases in the subcontract that it alleges unambiguously demonstrate intent to waive the statute of limitations, such as the statement that "[t]he Subcontractor is bound to the Contractor by the same terms and conditions by which Contractor is bound to [Virginia Tech] under the Contract," and that the subcontractor's warranty period covers any time "prior to Contractor's release from responsibility to [Virginia Tech] therefor as required by the Contract Documents." These provisions similarly fail to expressly indicate "knowledge of" and "intent to relinquish" the subcontractors' right to a limitations period. *May*, 205 Va. at 404, 137 S.E.2d at 865 (internal citation omitted). We therefore hold that the various identified phrases do not demonstrate sufficient intent to incorporate a waiver of the statute of limitations.

Furthermore, the prime contract itself did not expressly waive the statute of limitations by contracting for an unlimited limitations period. Rather, it is Code § 8.01-231, applicable to the Commonwealth and its agency, Virginia Tech, and not any of the contract documents that provided that no limitations period could be applicable as against the Commonwealth.[2] The subcontracts did not incorporate by reference and bind the parties to any waiver of limitations provision contained within the prime contract itself. Therefore, even if the terms of the prime

---

[2] At best, Section 45 of the prime contract, entitled "Guarantees," states that nothing in the section providing for a one year Guarantee against defects may be construed to *create* a (contractual) limitations period or limit the period for which the Contractor's obligation may be sought to be enforced. This acknowledgement does not rise to the level of an explicit contractual agreement to an unlimited limitations period.

contract were contractually imposed upon the subcontractors, the subcontractors would not be bound by a statutory waiver of the statute of limitations not incorporated into the subcontracts.

## C. *Accrual of the Statute of Limitations*

In the alternative, Hensel Phelps argues that the claims asserted in this suit did not accrue until the date of the settlement of the indemnification claim in 2014, rendering the suit timely. We disagree.

Code § 8.01-246(2) sets the standard limitations period for an action arising from a written contract for five years from the date of accrual. Code § 8.01-230 states that:

> In every action for which a limitation period is prescribed, the right of action shall be deemed to accrue and <u>the prescribed limitation period shall begin to run</u> . . . <u>when the breach of contract occurs in actions ex contractu</u> and not when the resulting damage is discovered, <u>except</u> . . . <u>where otherwise provided under</u> Code § 8.01-233, subsection C of § 8.01-245, §§ <u>8.01-249</u>, 8.01-250 or other statute.

(Emphasis added.) Code § 8.01-249(5) states that, "[i]n actions for contribution or indemnification," the action shall be deemed to accrue when "the contributee or the indemnitee has paid or discharged the obligation."

Hensel Phelps maintains that this is either an indemnification claim controlled by Code § 8.01-249(5), or, if a breach of contract claim under Code § 8.01-246(2), that breach of the indemnification provisions constitutes a separate and independent breach from the original failure to perform, triggering a second accrual of the statute of limitations on the contract.

We begin with Code § 8.01-249(5). "In interpreting [a] statute, 'courts apply the plain meaning . . . unless the terms are ambiguous or applying the plain language would lead to an absurd result.'" *Baker v. Commonwealth*, 284 Va. 572, 576, 733 S.E.2d 642, 644 (2012) (quoting *Boynton v. Kilgore*, 271 Va. 220, 227, 623 S.E.2d 922, 926 (2006)). Code § 8.01-249(5) refers

6

to "actions for . . . indemnification." *Id.* The counts at issue here were explicitly brought as actions for breach of contract, not indemnification.

Nonetheless, Hensel Phelps urges the Court to consider the substance of the claims rather than the form. We examine the substance of the claim in light of the subcontracts as a whole. "When considering the meaning of any part of a contract, we will construe the contract as a whole, striving not to place emphasis on isolated terms wrenched from the larger contractual context." *Babcock & Wilcox Co. v. Areva NP, Inc.*, 292 Va. 165, 179-80, 788 S.E.2d 237, 244 (2016) (internal quotation marks and citations omitted).

Each of the subcontracts contains a numbered paragraph expressly titled "Indemnification."[3] This, however, is not the provision under which Hensel Phelps alleges a breach occurred. We held in *Uniwest v. Amtech Elevator Services, Inc.*, 280 Va. 428, 442, 699 S.E.2d 223, 230 (2010), that an indemnification provision providing that Amtech would indemnify Uniwest from claims including those arising from Uniwest's own negligence was void for violating the public policy expressed in Code § 11-4.1, because it was "so broad that it indemnifies the indemnitee from its own negligence." In Hensel Phelps' subcontracts, which predated the *Uniwest* holding, the indemnification provisions similarly provide for indemnification against Hensel Phelps' own negligence. Because the *Uniwest* holding renders unenforceable the indemnification provision of Hensel Phelps' subcontracts, Hensel Phelps does

---

[3] Article 22, "Indemnification," provides:

Subcontractor expressly agrees to save and hold harmless, indemnify and defend the contractor, owner and the architect or engineer from and against any and all liability, claims, losses, damages, causes of action, costs and expenses, including attorney's fees, arising or allegedly arising from, personal injury or death of any person [or] property damage arising or growing out of the work performed . . . including any claim or liability arising from any act, error, omission, or negligence of the contractor.

not seek to enforce the numbered paragraph entitled "Indemnification," but instead attempts to repurpose other provisions of the contract as indemnification provisions.

A number of provisions of the subcontracts, taken in isolation, contain some degree of indemnification-like language. In perhaps the most explicit example, in the Article entitled "Payment," the subcontractor agrees to reimburse Hensel Phelps for "expended monies in defending, discharging, or otherwise disposing of any claim or lien or other demand in excess of retained or withheld sums." Yet, in context, it is clear that this provision is intended to pertain only during the time of the operative performance of the contract. The provision is found in the center of a lengthy Article pertaining to payment, addressing topics such as rate of progress, partial payment, final payment, and assessments of subcontractor's financial ability to perform. The phrase "in excess of retained or withheld sums" indicates a time prior to final payment. The provision is found in a paragraph that describes a potential breach by a subcontractor and failure to remedy that breach. The ability to remedy the breach before incurring damages links this language inextricably to proper performance of the contract, rather than as a freestanding indemnification provision.

Paragraph 14, entitled "Warranty," promises that "Subcontractor warrants and guarantees the work and materials which he performs or furnishes under this Subcontract and agrees to make good, at his own expense, any defect in materials or workmanship which may occur or develop prior to Contractor's release from responsibility to [Virginia Tech] therefor as required by the Contract Documents." This Warranty is likewise a performance provision of the contract, and the promise to make good for any defect is merely part of the promise to properly perform; it is not an independent indemnity provision. Unless otherwise explicitly provided for, warranties arising out of a written contract pertaining to performance are subject to the same five-year

8

statute of limitations provisions as any other breach of contract action under Code § 8.01-246. *Cauthorn v. British Leyland, U.K., Ltd.*, 233 Va. 202, 208-09, 355 S.E.2d 306, 310 (1987) ("[A] breach of warranty claim sounds in contract . . . when the damage claimed by the purchaser is the loss of his bargain with the seller."). As discussed in Part II.B, *supra*, the phrase "release from responsibility . . . as required by the Contract Documents" is not sufficiently explicit to dispose of the statute of limitations. While Code § 8.01-231 may provide for contractor's ongoing exposure to litigation from Virginia Tech, the contract documents do not establish an ongoing "responsibility."

We cannot agree that provisions such as these, scattered throughout the contract in other specific contexts and under other specific subtitles, were contemplated by the parties as independent indemnification provisions, particularly when there is a freestanding, albeit ineffectual, indemnification provision in the contract. We have said, "Typically, a contract of indemnity is a bilateral agreement between an indemnitor and an indemnitee in which the indemnitor promises to reimburse his indemnitee for loss suffered or to save him harmless from liability. But the indemnitor makes no promise to perform the obligation undertaken by his indemnitee." *First Va. Bank-Colonial v. Baker*, 225 Va. 72, 77, 301 S.E.2d 8, 11 (1983). Here, none of these provisions offer in the alternative to either perform or indemnify, but rather constitute "a direct and positive engagement to [perform]." *Oriental Lumber Co. v. Blades Lumber Co.*, 103 Va. 730, 737, 50 S.E. 270, 272 (1905). The specific provisions do not hold any extraneous obligation on the part of the subcontractors to indemnify and hold Hensel Phelps harmless from all liability arising from the failure to perform, but merely state that the subcontractor is responsible for the cost of remedying nonperformance or defective performance. It is clear from the context of the subcontracts that the Article entitled "Indemnification" was the

9

provision that contained language intended by the parties to cover instances of general indemnification.

Hensel Phelps argues that they would have had no cause of action upon the breach of performance, as they sustained no damages until 2014. We disagree. Under its subcontracts, had Hensel Phelps diligently attended to inferior work performed pursuant to its contract with the Commonwealth, it could have required subcontractors to fix any faulty or inferior work for five years following the breach in performance. This Court has recently reiterated that, "while some injury or damage, *however slight*, is required for a cause of action to accrue, 'it is immaterial that all the damages resulting from the injury do not occur at the time of the injury.'" *Thorsen v. Richmond SPCA*, 292 Va. 257, 279, 786 S.E.2d 453, 466 (quoting *Van Dam*, 280 Va. at 463, 699 S.E.2d at 482) (emphasis added). *Compare Van Dam*, 280 Va. at 463, 699 S.E.2d at 483 (plaintiff suffered primary monetary damage at the time of her ex-husband's death due to lost survivor benefits, yet the Court found initial injury and right of action ran from entry of her divorce decree), *with Thorsen*, 292 Va. at 279-80, 786 S.E.2d at 466 (testator suffered injury at the time of the creation of her will based upon attorney's failure to comply with their retention agreement, but third-party testamentary beneficiary lacked standing to bring a claim until testator's death: the beneficiary, possessing only a bare expectancy during testator's lifetime, sustained not even slight harm until the testator's death).

Finally, Hensel Phelps argues that the subcontractors' obligations constituted a continuing obligation. Generally, when an undertaking requires a continuation of services, the statute of limitations does not begin to run until termination of the undertaking. However, such continuing obligations typically apply to ongoing relationships pertaining to the same or related issues. *Wilson v. Miller*, 104 Va. 446, 447-49, 51 S.E. 837, 383 (1905) (continuing obligations

10

involve "continuous and frequent correspondence" or other ongoing relationship); *Farley v. Goode*, 219 Va. 969, 976-79, 252 S.E.2d 594, 599-600 (1979) (a dentist met the continuing obligation exception when he treated the same condition over a number of years). Here, although the parties agreed to warrant or guarantee that work was not defective, the original undertaking was a finite obligation completed upon performance and guarantee. The subcontracts did not include periodic inspections after completion of performance, for example. The right of action for property damage accrues, and the statute of limitations begins to run, upon breach, regardless of the presence of a warranty to correct the default. *Harbour Gate Owners' Ass'n v. Berg*, 232 Va. 98, 107, 348 S.E.2d 252, 258 (1986) (warranty did not affect accrual of the right of action on breach of performance although roof leak was not discovered at time of breach).

Hensel Phelps suggests that today's ruling places all government contractors in an untenable position of unending liability without the opportunity for recourse against their subcontractors. We disagree. The Commonwealth's contractors may draft or amend their subcontracts to comply with *Uniwest*. Today's ruling is consistent with the Commonwealth's larger statutory scheme, which relies on accrual of a right of action upon breach rather than upon discovery on most contract actions in the interest of finality. *See* Code § 8.01-230. Specific indemnification language within a subcontract would result in a later-accruing statute of limitations, as expressed in Code § 8.01-249(5). The language of the subcontracts in this case, construing each subcontract as a whole, does not state an intent to create an obligation on the part of the subcontractor to indemnify the contractor, other than the specific, unenforceable "Indemnification" paragraph, Article 22.

11

We therefore conclude that the right of action accrued upon breach of the performance provisions of the contract at some point between the commencement of construction in 1997 and completion of the project in 1998, or the repair work in the year 2000, and that the statute of limitations had thus long run by the filing of the suit in 2014. Because any breach by the subcontractors occurred at the time of their respective performances, the statute of limitations has similarly run against their sureties.

### III. CONCLUSION

For the aforementioned reasons, we will affirm the judgment of the circuit court.

*Affirmed.*